Good morning. My name is Binu Palal. I'm the Deputy Attorney General representing the state defendants in this matter. At this time, I'd like to reserve three minutes for rebuttal, and I understand that I'm responsible for making sure that happens. Good. Before the court this morning are two bills, SB 471 and AB 579, that address how Nevada should treat its sex offenders. Both bills were introduced by the executive branch and passed unanimously by the legislature in both houses. And while both bills address the issue of sex offenders, they address a different subset of issues. Given this court's recent request for briefing, I'll start with SB 471 and move on to AB 579. Now, the state's position from the outset is that SB 471 is not a retroactive bill. Now, this is very confusing to me, because one side is yelling, yes, it is, the other side is yelling, yes, it's not, and we have what I think is a defective order granting a permanent injunction saying that plaintiffs submitted declarations uncontroverted by the defendants making clear that the parole and probation department was applying SB 471 provisions retroactively. Yes, Your Honor. I think the record's clear that the state's position has always been that these bills ought not to be applied retroactively. Ought not or are not. Ought not and are not, that they shouldn't be and that they had never actually been applied retroactively, which is to say nobody was actually forced to move. Are there supposed to be declarations uncontroverted that shows that they are being applied retroactively? The one, they were controverted, and quite vociferously. Two, they … How were they controverted? They were controverted … Back in your office, did you say, this isn't true? Were you affidavits? No, Your Honor. Well, first of all, I don't think there's a need for affidavit in this instance. Judge Thomas, in his concurrence in Smith v. Doe, stated that ex post facto analysis does not require an as-applied analysis. Instead, it deals only with how the bill is actually written. And the bill is actually written not to apply retroactively. But second … Is that so? Because as I read it, it said, as far as lifetime supervision provisions, it said, as to any probation, any parole, any sentence. It didn't say, as to any prospective parole, prospective probation, prospective sentence. It said, any. The following movement and residency requirements will be applicable. Now, if we take a plain reading of that statute, it means that if a person is under lifetime probation, these additional measures will be attached to him. Yes, Your Honor. But why doesn't that read to apply retroactively to persons who have committed crimes? And the commission of the crime is the important date for ex post facto. Committed crimes before the passage of the legislation, who have been put on lifetime probation, and who wake up one morning when the act passes and find that they cannot drive, pardon that, he cannot drive past a bus stop on his way to work because the law prohibits him from doing that. Yes, Your Honor. If you look at the operative language, and the sections we're talking about are sections 2, 8, 9, and 10. And if you look at the SB 471. And if you look at the operative sections, it says shall order, for instance, when it comes to the probation, shall order the probation. These conditions shall be ordered as a condition of probation. But we know that when are the conditions of probation actually put on an offender? It's not, oh, and here's some updated probation conditions. No, the probation conditions are placed at the time of sentencing. There's no, there exists no mechanism to go back in time and apply these conditions. Have you ever seen a violation of probation case? Yes, I have. Somebody comes in, violated probation. Additional conditions are imposed. Right. In the instance that the predicate conditions are violated. But you don't, the violation of probation hearing never says, oh, by the way, come back in. Everything's been the same in your behavior. Come back in and we're going to add some more conditions of probation. So you're saying we should ignore the language that it kicks off with, an act relating to public safety revising the provisions concerning certain sex offenders who are on lifetime supervision or released on parole, probation, or a suspended sentence. Because that seems to suggest that it applies to people who are currently, it means they were convicted in the past. That we should ignore. I would suggest looking at the actual operative. That we should ignore. I'd say when in conflict, yes. I think when there are two, in a bill, if there are two provisions, one prospective, one that can be interpreted prospectively, one that can be interpreted retroactively, I think the court must default prospectively. Are you suggesting to us that taking our cue from Justice Cardozo's statement, that we should attempt to interpret the statute that is being attacked here in a way that it will be constitutional, and therefore interpret this statute as applying the new probation stipulations prospectively only? Yes. And in particular in this instance, where there is obvious conflict from the sections that actually initiate these. Because I think that you're implying that were we to apply this retroactively, were we to see this as a statute which applied retroactively, it would be in serious constitutional problems. No, Your Honor. The State believes that it can survive a Smith v. Doe ex post facto challenge. But we believe at the outset that if the State isn't, if the court is inclined not to find that it could. Wait a minute. Smith v. Doe had conditions five and six, which have to do with the excessive punitive nature of the civil remedies. And the only case that's dealt with residence requirements for sexual molesters is Doe v. Miller, which only dealt with residence, not movement. Sure. And also had a grandfather clause which allowed the person to remain in a prohibited even though it was prohibited, so long as he was there at the time that the act was put into effect. So that's quite a different statute from this. What I'm asking you is this. If we're going to entertain this challenge as being a facial challenge, must we not read the provisions of the act, if they're going to be retroactive, as written, that is, that Mr. Doe cannot drive past a bus stop because a bus stop is an area that has prohibited him? No, Your Honor, because the actual operative aspects and the operative sections of this bill can only, as a matter of practicality, be applied prospectively, not retroactively. There's no ‑‑ We're not on the same line. Suppose that we find that this statute applies retroactively. Just hold that idea in mind, right? Okay. Your position is, well, even if that occurs under the Alaska case, it passes muster. Yes, Your Honor. Now, the Alaska case didn't involve a restriction on a person driving by a bus stop. That's correct. Now, do you think that there's a difference between the Alaska statute and this statute? Yes, Your Honor, I do. But I think the ‑‑ How can you justify as being nonpunitive the provision that he can't drive by a bus stop? Well, I mean, we have to look at the actual factors, right? No, no, no. You can't look at the actual facts. You've got to look at the language. You're talking about a facial challenge. No, I'm talking about ‑‑ I'm sorry if I was unclear. What I meant to say, you have to look at the effects analysis applied by the Smith v. Doe court. I'm sorry if I was unclear. The factors of the effect, you know, those are historical ‑‑ this is considered historical punishment. Six factors. Yes. But even taking a step ‑‑ before we even get to that, it's the burden isn't on the state, Your Honor. It's the burden is on the Does to show by the clearest proof that this is punitive. Hasn't the plaintiff done that by showing by the clearest proof that he can't possibly live in an urban setting? They've never ‑‑ Suppose a man has to take a ‑‑ he doesn't have a car. Suppose he has to take a bus. He can't go to a bus stop to take a bus to go to work under this ruling. Your Honor, they have not established that they can't live in an urban area. There's been no ‑‑ So what you're saying is that it fits within the Alaska case to say a person who is under lifetime probation must move to a rural area. No. To comply. He's got to leave wherever he's living and move to a rural area where there are no buses. No, Your Honor. And there are no schools. When I mentioned a rural area, I was merely echoing your question when you said that he can't ‑‑ that a person had to move to a rural area or couldn't live in a rural area. I'm not conceding the point that somebody couldn't live in Las Vegas or Reno or Carson City. In fact, there's been no evidence that somebody couldn't live in any of those three most populated cities of Nevada. So you think there ought to be an evidentiary hearing? I think if the court is inclined to ‑‑ if the court is inclined ‑‑ you know what? No, because the burden is on the ACLU to show this by the clearest proof. The fact that they haven't shown it by the clearest proof ‑‑ Did they ask for an evidentiary hearing? They did not. They submitted, what, 10 to 12 declarations? They did. And what did the people say in those declarations? There's no place we could live in Nevada? No, largely it was that we were told to move is the sum of what their declarations were. The declarations in large part dealt with the fact ‑‑ dealt with the allegation that these residency restrictions were already being applied. Well, then let me go back to that. You say Section 2, we read that, it says the court shall. That's purely perspective. What are the other sections you said that ‑‑ The operative sections are Section 2, Section 8, Section 9, and Section 10. 2, 8, 9, and 10. What about 6? 6. 6. NRS 1790D460 is hereby amended to read as follows. In addition to any other registration that is required pursuant to blah, blah, blah, each sex offender who after July 1, 1956, is or has been convicted shall register. So that goes back and scoops up everybody since 1956, doesn't it? Sure, but that's not a movement or residency requirement. That's not a movement restriction. It's not a residency restriction. That's registration and notification, which falls under a different rubric. And if you also look at Section, I believe it's Section 17, it states that these laws go into effect after October 1, 2007. But absolutely, this bill along with AB 571 does have an element that registration and notification requirements, which are different than conditions of parole, conditions of lifetime supervision, are retroactive. And the state admits that registration and notification requirements are retroactive. The point is that in terms of movements and residency restrictions, those are prospective. And if the Court permits, I'll reserve the two minutes. So you're basically telling us, though, if we were to agree with you that 471 on its face is not punitive and then we go to the next step on effects, that would have to go back for an evidentiary hearing? Because you say there is no evidence? They never got there because the trial court said, well, it's just punitive, so it's over. So you don't have to have an evidentiary hearing? I don't see that there could be evidence that they could show. That being said, I mean, if the Court's ruling is that those need to go down to the lower court and demonstrate by the clearest proof that this is punitive, then the state will acquiesce to that. And I'll reserve the time. You've seen the plaintiff's revised order granting a permanent injunction probably more than once. Am I right? Yes, Your Honor. At the very end of it, there's a date, October 7, 2008. It looks like there's a signature up above it that's not a signature. It looks like a stamp. Am I right about that or not? Yes, and I think the metaphor is appropriate. There are no findings, in fact. That's a good line. Thank you. Okay. Well, we'll hear from the other side. Good morning, Your Honors. Maggie McCletchie for the appellees. First of all, with respect to SB 471, there were 14 declarations submitted that detailed the effects of both laws. There was never a finding of fact at all in this case that this was so punitive because there was no place you could live or you couldn't work or you couldn't breathe. There's no finding of fact. There were findings of fact that there were punitive effects, but there were no ‑‑ Where are the findings of fact that there's punitive effects? One moment, Your Honor. Judge Mahan stated at the end. Of what? He stated that. At the end of what? I'm sorry. I'm trying to locate it. Give me one moment, sir. You mean in the transcript of the proceedings in the hearing? In the transcript of the proceedings, he discussed the fact that there was punitive intent. He talked about the ‑‑ and during the order, he mentioned that there were additional penalties. I have to tell you, this order is not even worth the paper that it's written on. This is an order that was prepared by your side. It was unilateral. It's stamped by a judge, not even signed, and it contains information that's nowhere near what he found in his oral statement. I can't find anything in his oral recitation about the contracts clause, and yet you wrote it into the findings of whatever you want to call it, the conclusions of law, granted the permanent injunction. Your Honor, I agree that the order could be more detailed, and it could be ‑‑ You wrote it. I agree, Your Honor. And it doesn't comply, it doesn't square up with what the judge said from the bench. The judge did hold that it was a violation of the contracts clause. Where? Where during the transcript.  I can locate that for you in a moment, sir. The judge says, well, I'm not going to make any broad ruling. I'm going to rule on exactly what's been presented to me, and that is these laws are unconstitutional as applied. Yes, they are. Ms. McCletchie, we'll be happy to prepare an order, Your Honor. All right. Just a matter of clarification, says Lichtenstein. Okay. The grounds are due process, equal protection, and ex post facto. The court, yes, I mean, and double jeopardy. Lichtenstein, double jeopardy. Yes, Your Honor. That's it. I don't see any contracts clause in there. Your Honor, the district court reviewed and approved the order, and I did want to make one note about the findings of that. I'm not sure that that's true. You know, the Supreme Court tells us to be very wary of orders prepared by lawyers that haven't been reviewed by courts, and I think this is one of those cases. It looks like this is a stamp and not even a signature on this order, and it contains information that's nowhere close to what he held. The court made typographical edits to the order and called our office, and we incorporated his edits and his changes, and he did approve them. Where's that on the record? It's not on the record, but he did approve that order, and it certainly could be remanded for clarity regarding the order and the scope of the order. With respect to the question about factual findings, I want the record to be clear that we did submit 14 declarations that did detail the effects on the plaintiffs. We also actually asked the court for the opportunity to seek discovery. The State objected to our request for discovery, said none was necessary in this case, and we sought an extension of the scheduling order in the case. Again, the State objected to it and said no discovery was necessary or appropriate in this case. On appeal, they're limited to the scope of the factual record they created. Your supplemental filing seems to suggest there's no evidentiary hearing needed in this case. Am I right? I don't think that there is an evidentiary hearing needed because for a number of reasons. First of all, I don't think that the intent with SB-471 nor with AB-579. What a discover if you didn't think an evidentiary hearing was necessary. I can't recall all the discovery we wished to seek, but we wanted to seek, for example. Now you're telling us that's all irrelevant. Well, I think it's irrelevant because I do think that we created enough of a record to show, for example, that people couldn't go to work, that people couldn't drive around the city. There are no findings of fact. There are none. Zero. You have declarations, but that's it. Well, I think we don't even need to get to the second prong. What if we conclude that you do? If you include that you do. If we were to conclude that 471 on its face is not punitive, then you do. Then perhaps it could be remanded for clarity regarding the order. And that's what we asked, and you say no. I don't think it needs to be remanded because I think it's punitive in intent, and if it's punitive in intent, you don't even need to consider the effects. But we ask you to assume that it might not be. We're trying to figure out the appropriate resolution, and if we should come down, I can't tell you where we're going to come down, but if we should come down on the side that it's not punitive on its face, then what has to happen? You say nothing because it's still, by your declarations, shown to be enough so punitive that it fails the second part of the test. That's correct. I think our declarations do detail that transcript of the judge's discussion and the order stating that these effects were punitive. The judge made a finding that the effects were punitive. I'm totally confused. Okay. By this language of the district court. No, I'm not saying that. I'm not going to make any broad ruling. I'm going to rule on exactly what's being presented to me, and that is are these laws unconstitutional as applied retroactively? And, yes, they are. I don't understand whether that is a finding by the court of, A, facial unconstitutionality based on the language of the statutes, or, B, as applied unconstitutionally based on the affidavits and proof submitted to him. Do you have a position on that? Is it A or is it B? I believe that it's based on the affidavits submitted to him, because they were extensively, because it's B, because we submitted those to the court. As applied is an as applied challenge. And it's a facial. It's as applied to the plaintiffs, and it's a facial challenge, because as the State points, I think it's both, because as the State points out. Well, wait a minute. Let me, before you jump into that particular position, if we read the statute as the State suggests we read it, we will read it to apply prospectively. You lose. Do you want to talk about as applied, pardon me, as a facial challenge? I think that if we read it, with respect to the facial challenge, if it's read to be only prospective, then we win, because that was our whole concern with the law, was that it was applied to our client retroactively. Then what you're saying is, Judge, please forget the facial challenge. Even if it is read to be prospective, it is being applied retroactively, and therefore it is an as applied challenge. And then the next question is, that my brother Trott has put, where are the findings of fact by the court, trial court, that as applied, it was applied retroactively with punitive intent or the effects of which are punitive? Only the court's discussion and the conclusions in the order, Your Honor. And I think certainly SB 471 could be remanded for clarity regarding the order. You say on line 22 of the executive record, page 6, plaintiffs submitted declarations uncontroverted by the defendants, making clear that parole and probation was applying 471's provisions retroactively. I'm confused by that, because all I hear the other side screaming at the top of their lungs is, we're not doing that. And it seems that they have been controverting that all along, and yet in this order prepared by you it says uncontroverted. They've never submitted it. They've never submitted any of their own facts, and they took the position in this case that no discovery was appropriate. So they did not controvert the actual facts that we submitted to the court. They did not have a declaration from the head of parole and probation saying that this was not being applied retroactively. They submitted absolutely zero facts during the district court, and when we sought discovery, they took the position that no discovery was appropriate in this case. If I might move on to AB579, I do want to point out. Let me ask you an atmospheric question. Is this or is this not being applied retroactively? Is SB471 being applied retroactively? It is my understanding, because now it's enjoined, it's not being applied retroactively now. It was being applied retroactively because our clients were told, we got an injunction, so it's not being applied retroactively. We needed an injunction for those parole and probation officers that were telling our clients that they had to move, that they couldn't go within 500 feet of a bus stop or numerous. It's not just a bus stop. It was numerous other locations. We needed a court order to stop those parole and probation officers from doing that. Our clients have reported to us that they're no longer doing that, and it's because we got an injunction. We attempted to work out this issue with the state before even filing a suit to try to get some clarity, and they changed their own position a number of times, which might suggest that the statute is facially vague and ambiguous because we had to go back and forth numerous times. Their own office has taken different positions. Different branches of the Nevada state government have taken different positions regarding the language of SB471. The effect of the court's order is to change about 40 to 50 sections of Nevada law. What the court's order did was he wanted to ensure that the prior law was still enforced, that we still have a way to track and monitor dangerous sex offenders in Nevada. What he did was he enjoined the changes in AB579 and SB471 that would have entirely reclassified offenders and changed the nature of registration and notification extremely drastically in ways that put us way far outside of the kind of registration and notification laws we're talking about in Smith and entirely outside the kind of sex offenders we're talking about in Smith. Okay, now we're on 579. Yes. And what's so exciting about 579 that puts it outside of everything that's gone before, including Smith and Connecticut and all the rest? I think there's a number of ways in which it's very different from Smith. While, for example, in Smith they relied upon a study to justify the presumed future dangerousness and projected recidivism of the sex offenders that were targeted, the study only dealt with child molesters. Here we are dealing with a broad category of sex offenders that include people who have committed misdemeanors, any crime involving a sexual element or deemed sexually motivated, any type of indecent exposure. In the Alaska law, for example, it was limited to felony indecent exposure or indecent exposure to a child. The crimes were really focused on violent sexual assaults in Alaska and on crimes against children. Here in AB 579 the definition is much, much broader. And so I think there's a danger in saying, well, sex offender laws are constitutional because of Hendricks and Smith, and I think what we need to do is look at the actual nature of AB 579. It's different in other ways, too. But in Smith the court says, the ex post facto clause does not preclude a state from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences. And I guess what you're saying is what Nevada did wasn't reasonable. It wasn't reasonable. And what the Smith court also said is that it's constitutional to pass these kind of laws to target sex offenders who have been adjudged dangerous. For example, in Hendricks we're dealing with people who met the high standard for civil commitment. Smith says you can just do this by categories alone. You don't have to judge an individual dangerous or not. Smith says a category is good enough. Smith also has language that says that the target of that law were people who had been adjudged dangerous. And they actually, the huge difference between Smith and what we have in Nevada, too, is in the Smith case the legislature actually made findings that the targets of the law posed a real danger. I don't think Smith says you can just call. Doubtless one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. See, I like buts because it always takes away everything. But the legislature has power in cases of this kind to make a rule of universal application. The state's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of they're dangerous, does not make the statute punishment under the ex post facto clause. So they seem to be saying a legislature can just put people in a class and we don't care whether you're dangerous or not. You're in that class, it's over. But I think when you look at the other factors in that case, they mention that the Alaska legislature actually made a finding that these sex offenders were dangerous. And again, while they use the label sex offender, they were dealing with a different set of sex offenders that we're dealing with in this case. And I don't think the government can say. For example, we could say it would advance public safety to require all criminals to register and monitor. Is 579 just a reiteration in state terms of SORNA? It's the aspect. I see a lot of heads bobbing up and down over there. It requires different things. The Adam Walsh Act included the portions that tried to get states to enact compliant legislation. Most states have not done so because the requirements in SORNA are so extreme. And in a number of states that have, state supreme courts have thrown them out. There's also a federal aspect to SORNA that requires you to register federally, pursuant to whatever the state law is. So there's two aspects to SORNA. But I think here we're also far afield from Smith because of the nature of notification and the nature of registration. And I think we're also far afield from Smith because there is no clear civil intent in this case. When you're challenging a law on ex post facto grounds, you're required to meet a very high burden as a challenger where there is clear civil intent. Here, based on my read of legislative history, all the signs point towards punitive. For example, it's codified entirely in the criminal code. You know what Smith says about that in Connecticut. I mean, that's irrelevant. Well, Smith doesn't say it's irrelevant. Smith said it was a relevant factor, but Smith was also codified in two places. Regardless, even if we say it's a wash, there's no evidence of civil intent. There's no conclusive evidence of punitive intent. When we get to step two of the analysis, if we say, well, it's not clear what the intent was, how do we look at effects, I think that's an open question. For example, the concurrence and dissents in the Smith case, as well as concurrences and dissents in the Hudson case, talk about the fact that that kind of high standard of proof should not be required where the intent was not clearly civil. Here, maybe we can say it's inconclusive, but we certainly can't say there is a clear civil intent. There weren't the kind of legislative findings, the declarations of public safety. There's not that kind of evidence here. The only evidence we really have is codification, and that alone, that's the only formal attribute we have to look at, and that points towards punitive. In addition to community- In AB 579, there's no indication that the legislature intended to change what had been the existing law in Nevada as to the purpose of this. Was there? They didn't say we're changing this now. We're going to make this part of the punitive thing. So your argument leaves me kind of cold that there, you know, that there had to be some kind of proof that they didn't intend it to be criminal. I don't think there was anything in courts interpreting the Adam Walsh Act. None of those people. They've always said this was the registration and notification was not intended to be punitive. This circuit has not had a case that made any findings regarding the federal government's intent in passing the Adam Walsh Act. What did Nevada do that makes you think now that these amendments are moving it from the- From civil to punitive? Yes. Well, the last time Nevada looked at sex offender laws, before these changes were in place, the legislature explicitly discussed the fact that having a risk-based assessment was necessary to promote public safety. And so I think by undoing it and changing, and changing so drastically the scheme, I understand there are still sex offender laws. The pre-existing law was a sex offender law. AB 579 changes were still a quote-unquote sex offender law. But I don't think just because it was a sex offender law makes it civil in intent. I think that the changes in AB 579 were so extreme, and apparently saw it done quickly only in order to get federal funds, but they were so extreme that I think they drastically changed the nature. There's no discussion of public safety. The last time they talked about public safety, they said risk assessment is what is necessary for public safety. The Supreme Court said you can do it by category. You don't have to do it by risk assessment. But that doesn't change the Nevada legislature's intent, though. When we're talking about what was their intent, there is absolutely no evidence during the course of AB 579, and I think we really need to look at the four corners of the statute and the legislative history of that statute to try to figure out what was their intent. And I think at best it's entirely unclear, and if it's unclear, I don't think that the challenger should have to meet the high burden of proof. Just the other way around. But anyway, you've run out of time, and we promised a couple of minutes of rebuttal to the State of Nevada. Thank you, Your Honors. Thank you. I appreciate the Court's indulgence. Quickly, there are a few points I just want to discuss. When you talk about SB 579's intent, I just want to refute the point that there's no indicia of intent when that bill was submitted by the Attorney General's Office and was submitted with testimony, and that testimony said two things. One, that we need to pass this bill in order to be compliant with AWA so that we can retain our Edward Byrne grant. So you can retain your what? Edward Byrne grant, the federal grant. Oh, Edward Byrne grant. And then the second aspect, though, I think is instructive here. Deputy Attorney General McKella stated, this also makes our sex offender laws more objective. And then he listed in his letter, this is included as part of the record in the legislative history, the problems with the current system that people would, through multiple hearings, the tiering would slowly go down and down and down. So what he thought was that an objective system would better serve the public safety. Where is this in the record? It's legislative history to AB 579. I believe it's under appendix, tab five. And there's a letter at the very beginning. I don't have the actual. It is in our record. It is absolutely in our record and in the lower record. Okay. We, meaning we'll find it. I don't pity you. I mean, I'm not jealous of the clerks at that moment. But I do believe that the last thing I want to say is I think there's an implication that those are making that is just false and leads you down the false path, which is somehow that they're not required to show the effects by the clearest proof. And they cite to a concurring opinion proffering a different standard than the majority and dissenting opinions that proffer a different standard than the majority. But by the majority, not plurality, but the majority of the courts say the standard in these cases is clearest proof. And I don't think Doe's can escape that. And lastly, I think Justice Souter's concurrence is instructive in one area. He doesn't believe that the sex offenders should have to show by the clearest proof. He thinks the factors kind of go both ways. But he still finds in favor of finding the constitutionality of the Alaska law the reason, the presumed validity of statutes passed by the state. With that, I thank you for your time. I have a couple other questions. I don't have the declarations in front of me. But do the declarations say as represented that, hey, they're applying these new laws to us retroactively. Is that what they say? We're being told you have to move. Yes, they do say we're being told you have to move. What does that suggest? To me, it's unclear what that suggests. Certainly in an evidentiary hearing, that testimony by itself I don't think would be admissible. But you blocked the discovery and said one was not necessary? We did say that. Why would it be inadmissible for a person to say I have a letter here from my state probation officer, and he tells me I have to move when introduced against the state? First, I don't believe there is a letter. What you have is the state man called me up on the telephone. He is an agent of the defendant state of Nevada, and I would like to tell you what he told me. Would your objection be hearsay? They would have to establish that he was acting as an agent for the state first, as a predicate. Well, he could establish that by saying he called me and he said I am your parole agent, and this is an official. I don't think they said it. I don't think the record is clear that they said I am. You don't think? What did they say? I don't think they said this is the new state policy. I don't think this is official. I thought you said that the declarations say that we have to move. They said upcoming, I believe the declarations say upcoming you might have to move, yes. And who told these declarants that? I think their claim is without any letter that I'm aware of is that it was parole and probation officers. Well, would you agree to represent to this court that if the parole officer said that, the state of Nevada apologizes to the clients of the ACLU and undertakes never to have that happen again? Absolutely. There you go. Thank you. And on that note. Great opportunity. I appreciate it. And on that note, we will adjourn. But we will adjourn today. This case will be submitted. ACLU versus Cortez Massa. We adjourn today remembering that the date is December 7th. President Roosevelt called this, quite correctly, a date that will live in infamy. It was a date of the Pearl Harbor attack by the Empire of Japan. And I'd like to adjourn in memory of those brave men and women who fought the Empire of Japan and defeated it and guaranteed our safety and liberty. Thank you very much.
judges: Stafford, Trott, Bea